UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROGER CRIQUE,                                          :

        Petitioner,           :       10 Civ. 6942 (PAC) (GWG)

  -v.-                                                    :       REPORT AND
                                                             RECOMMENDATION
                                                 :
WILLIAM LEE,
                                                 :
        Respondent.
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Roger Crique, proceeding pro se, brings this petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 following his conviction for murder in the second degree. For the reasons stated below, Crique's petition should be denied.

I.    BACKGROUND

    A.    Trial

      The following is a summary of the relevant evidence presented at trial.

      Cheyenne Patricio ("Patricio") met Crique, who was sometimes referred to during trial as "Jason" or "Jae," in 2000, when she was 17 years old. (See M. Montas: Tr. 42-43; C. Montas: Tr. 125-26).[1] Patricio and Crique dated for a number of years. (See M. Montas: Tr. 44). As time progressed, Crique and Patricio's relationship became volatile. Patricio's friend and former roommate, Maria Perez (see Perez: Tr. 354), testified that Crique and Patricio "were always [ ] arguing," would often raise their voices at each other, and that Crique snatched a phone from Patricio on a number of occasions (see Perez: Tr. 357-60). On one occasion, Crique "punched

---

[1] "Tr." refers to the trial transcript which has been docketed in two volumes. See State Court Transcript, filed Feb. 3, 2011 (Docket ## 21, 22) ("Tr."). "S. Tr." refers to the sentencing transcript which is located at the end of Docket # 22.

the [bathroom] door . . . and . . . put a hole in it," after Patricio had locked herself inside. (Perez: Tr. 358). While Perez never observed Crique strike Patricio, she would "hear them arguing as [she] was leaving for work, and when [she] would come back, [she] would find [Patricio] with black eyes." (Perez: Tr. 357-58). Perez also witnessed Crique push Patricio up against a wall, grab her by the neck, pick her up, and threaten to kill her. (See Perez: Tr. 361).

Sometime in 2005, Patricio began to distance herself from Crique. (See M. Montas: Tr. 57; C. Montas: Tr. 130-31; C. Patricio: Tr. 163; Perez: Tr. 364). Patricio told a friend, Miriam Montas, that she had "broken up" with Crique, "that he didn't want to let her go," and that he had told Patricio that he was going to kill her. (Miriam Montas: Tr. 388). Crique "obsessively" called Patricio's house at all hours of the night. (C. Montas: Tr. 129; see M. Montas: Tr. 56; C. Patricio: Tr. 174). The phone calls were so frequent that Patricio's family had to disconnect the phone so that they could sleep. (See M. Montas: Tr. 56; C. Patricio: Tr. 174-75). On September 21, 2005, Patricio told her sister and her mother that "she was through with [Crique], that she thought she was backtracking," and that "[s]he wanted to move forward . . . ." (C. Patricio: Tr. 166).

On September 22, 2005, Patricio's sister and mother left the family apartment for the day, leaving Patricio at home. (See M. Montas: Tr. 67-69; C. Patricio: Tr. 168). When they returned around 9:00p.m., they found the door unlocked, the television on very loud, and all the lights off in the apartment. (See M. Montas: Tr. 70-71; C. Patricio: Tr. 168-70). When they opened the door to the bedroom, Patricio's sister noticed blood on the floor. (C. Patricio: Tr. 169). They turned on the lights and saw Patricio "lying on the floor," and there was "blood everywhere." (C. Patricio: Tr. 170-71; M. Montas: Tr. 71). 911 was called (see M. Montas: Tr. 72; C. Patricio: Tr. 171) and paramedics arrived on the scene (see Bonamico: Tr. 179, 182).

When the paramedics arrived, Patricio was alive and breathing, but was badly beaten and bleeding from her neck. (See Bonamico: Tr. 184). Patricio died as she was being taken to the ambulance. (See Bonamico: Tr. 190-91). Dr. Jacquelyn Morhaime performed an autopsy. (See Morhaime: Tr. 794-95). She concluded that Patricio "had multiple injuries about her head and upper portion of her torso and also [on] her upper extremities." (Morhaime: Tr. 796). In addition, there were numerous wounds throughout Patricio's body, including but not limited to, "blunt impact injuries,"[2] "sharp injuries,"[3] and "defense wounds." (See: Morhaime: Tr. 796-98). Morhaime determined that the cause of Patricio's death was "stab wounds of [the] neck and chest with injuries of major vessel and lung and blunt injury of [the] head with scalp laceration." (Morhaime: Tr. 841-42).

Sometime after the police arrived on the scene, they discovered Crique on the roof of Patricio's apartment building. (Walsh: Tr. 207-11; Walla: Tr. 412-14; Vargas: Tr. 644-46). Crique "was bleeding from various parts of his body" (Walla: Tr. 413), had "a number of slice marks coming across his left wrist[,] had a few longer slice marks on his neck, and . . . had . . . multiple puncture wounds in his chest area." (Walla: Tr. 418; see Vargas: Tr. 646-47). When asked how he had gotten on the roof and who had injured him, Crique told the officers that he did not know. (See Walla: Tr. 416-17, 420; Vargas: Tr. 647). While Crique initially identified a third, unknown person as Patricio's killer (Walla: Tr. 435, 436-37), he eventually admitted to

---

[2] "Blunt impact injuries" include "any injury that is caused by . . . blunt impact, that can include . . . contusions . . . [and] abrasions." (Morhaime: Tr. 797).

[3] "Sharp injuries" refer to "either stab wounds . . . [,] a sharp injury in which the depth of the wound is greater than the length of the wound . . . [or] an incised wound in which the length of [the] wound on the skin's surface is greater than the depth of the wound in the tissue." (Morhaime: Tr. 797-98).

police that he had stabbed Patricio numerous times (Walla: Tr. 442) and had hit her with a bat (Walla: Tr. 442). However, he provided the police with various accounts as to what had transpired. (See Walla: Tr. 442-43, 452-58; Vargas: Tr. 655-57).

One of Crique's defenses at trial was that at the time of the homicide he was suffering from an extreme emotional disturbance ("EED") – a defense that if successful would have reduced the charge from second degree murder to manslaughter, N.Y. Penal Law § 125.20[2]. (Tr. 1636-37). Crique also presented the defense of justification. (See Tr. 1636). In support of the EED defense, Crique called Dr. Alexander Sasha Bardey, a board-certified psychiatrist, who had been deputy director of the Bellevue forensic psychiatric service and director of mental health at Rikers Island. (See Bardey: Tr. 1077-78, 1079-80). Dr. Bardey testified that Crique acted under the influence of an EED when he killed Patricio (Bardey: Tr. 1252), although he stated that it "was not an easy call in this case" (Bardey: Tr. 1257). During the course of his testimony, Dr. Bardey acknowledged that there were numerous factors weighing against a finding of EED (Bardey: Tr. 1115-18, 1165-67, 1232-33) and testified that he based his views regarding EED, in part, on Crique's statements that Patricio had stabbed him and the self-inflicted wounds on Crique's wrist and neck, which Dr. Bardey believed could have been part of a suicide attempt by Crique (see Bardey: Tr. 1122-24, 1149-50). Dr. Bardey testified that "if [Patricio] had inflicted the wounds and if [Crique] attempted to take his own life he may have been suffering under a[n] EED." (Bardey: Tr. 1243). On cross-examination, he acknowledged that it was difficult to "put credence in anything" Crique said. (Bardey: Tr. 1237).

During his direct examination, Dr. Bardey testified as to the materials he had utilized in performing his evaluation. (Bardey: Tr. 1087-88). Dr. Bardey stated that he had relied upon Crique's medical and school records, "documents that were provided as part of [the criminal]

4

case file," and interviews with "[p]eople who knew [Crique] well, who could give [Dr. Bardey] a sense as to what kind of person he was," including members of Crique's family (Bardey: Tr. 1088-89). Defense counsel then asked Dr. Bardey: "Were you given access to the deceased's family to interview them with respect to your evaluation in this case?" (Tr. 1089). The prosecutor's objection to this question was overruled and Dr. Bardey responded "[n]o." (Tr. 1089).

On cross-examination, the prosecution re-elicited from Dr. Bardey that he had not interviewed Patricio's family and then asked: "Did you ask if you could speak to them?" (Tr. 1183). When objection was made, the prosecutor withdrew the question and then asked: "There is no legal prohibition given to you by that you couldn't speak to the victim's family?" (Tr. 1184).

A side-bar conference out of the hearing of the jury then ensued in which defense counsel objected to the question on the ground that Dr. Bardey was unable to interview Patricio's family only because the defense was never provided with a list of names and contact information from the prosecution despite the fact that defense counsel had requested this information. (Tr. 1184-85). The prosecutor denied these allegations but nonetheless agreed to withdraw his question and "move on" to other issues. (See Tr. 1186). The jury was then instructed that the prosecutor's question was withdrawn. (Tr. 1186).

After the conclusion of Dr. Bardey's testimony, defense counsel moved for a mistrial on the ground that the prosecution had improperly questioned Dr. Bardey about his failure to interview Patricio's family, which defense counsel argued left the impression that Dr. Bardey could have conducted these additional interviews and had just failed to. (Tr. 1259-60). The trial court denied defense counsel's motion. (Tr. 1260).

On rebuttal, the prosecution called Dr. Stuart Kirschner, an associate professor at John Jay College of Criminal Justice (Kirschner: Tr. 1274-75), who testified that he did not believe Crique was acting under the influence of an EED when he killed Patricio (Kirschner: Tr. 1297-98). In addition, Kirschner stated that this case was not a close call and that the case "[ran] totally contrary to anything that [he understood] about extreme emotional disturbance." (Kirschner: Tr. 1355). Kirschner testified that in making his determination he had interviewed Crique twice (Kirschner: Tr. 1291); reviewed Dr. Bardey's report as well as Crique's medical, school, college and vocational training records; and reviewed reports from a drug treatment program Crique had participated in. (Kirschner: Tr. 1291-93). In addition, Kirschner conducted interviews with Roger and Jessica Crique, Crique's father and sister, as well as various members of the Patricio family. (Kirschner: Tr. 1291, 1307).

During summation, defense counsel criticized Dr. Kirschner's determination that Crique was not suffering from an EED at the time of the homicide, arguing that Dr. Kirschner's opinion was "not objective" and not corroborated. (See Tr. 1478-82, 1489, 1490, 1491, 1501). In its summation, the prosecution attacked the testimony of Dr. Bardey. While the prosecution acknowledged that Dr. Bardey was "clearly qualified" with "impressive credentials" (Tr. 1526) and was honest in his testimony (Tr. 1545), they criticized his determination that Crique was acting under an EED when he committed the homicide. (See Tr. 1526-56). The prosecutor emphasized that Bardey had "only interviewed [Crique's] family, those same people who love him" (Tr. 1532), and he "didn't interview [Crique's] friends" or the victim's family. (Tr. 1533). Additionally, the prosecution exhorted the jury to "compare" Dr. Bardey's examination to Dr. Kirschner's, "who interviewed both sides." (Tr. 1546). Defense counsel objected to the prosecutor's statements. The objections were overruled by the trial judge. (Tr. 1532, 1546).

At the conclusion of the prosecution's closing argument, defense counsel made an application for a mistrial (Tr. 1558) or a curative instruction (Tr. 1564-65), arguing that the prosecutor failed to turn over information regarding Patricio's family to Dr. Bardey (Tr. 1558-60) and that the prosecutor's statements during summation gave the "false impression to the jury that Doctor Bardey did something other than what he should have [and] was negligent in not interviewing the family . . . ." (Tr. 1560). In response, the prosecutor noted, inter alia, that Dr. Bardey had access to Crique "who . . . [knew] the victim's phone number" (Tr. 1561) and thus "[n]othing . . . stopped Doctor Bardey from reaching out." (Tr. 1562).

The court denied defense counsel's request for a mistrial, finding that the "attack on Doctor Bardey's conclusions was just that, an attack on the conclusions and not on Doctor Bardey himself." (Tr. 1565). While the court refused to provide an instruction specifically stating that the defense had requested to speak to Patricio's family and the prosecution failed to accommodate the request (see Tr. 1565), the judge instructed the jury that "[q]uestions alone are not evidence," that the jury was "not to conclude from just a question alone that anything assumed in the question [was] true no matter how detailed or specific the [questions were]" (Tr. 1616), that the jury was "not required to accept the argument either party made during summations," and that "nothing that the attorneys said . . . in their summations [was] evidence in the case" (Tr. 1614).

    C.    <u>Verdict and Sentencing</u>

On June 4, 2007, the jury found Crique guilty of murder in the second-degree. (See Tr. 1688). On July 16, 2007, petitioner filed a motion, pursuant to Sections 330.30[1], 330.40, and 330.50 of the New York Criminal Procedure Law for an order setting aside the verdict and granting a new trial. Notice of Motion (annexed as Ex. 4 to Appendix to Motion to Dismiss for

Failure to Exhaust State Remedies, filed Dec. 6, 2010 (Docket # 6) ("Resp. Appx.")) ("330 Motion").  In the motion, Crique's counsel argued, inter alia, that the verdict should be set aside because the prosecution's conduct "in its questioning of . . . Dr. Bardey . . . was so prejudicial as to influence the jury in its determination of whether the defendant was suffering from EED at the time of the homicide."  Affirmation (annexed as Ex. 5 to Resp. Appx.) ("330 Aff.") ¶¶ 9-12.  On October 16, 2007, the court denied Crique's motion.  See Decision and Order (annexed as Ex. 6 to Resp. Appx.).  Crique was sentenced to 25 years to life imprisonment. (S. Tr. 30).

      D.      Direct Appeal

Crique appealed his conviction to the Appellate Division, arguing inter alia, that the trial court "unconstitutionally impaired the jury's fair and accurate assessment of [Crique's EED] . . . defense[] . . . by allowing unwarranted disparagement of the defense expert . . . ."  See Brief for Defendant-Appellant New York Supreme Court Appellate Division – First Department (annexed as Ex. 7 to Resp. Appx.) ("Pet. Ap. Brief") at 54.  The Appellate Division affirmed Crique's conviction.  See People v. Crique, 63 A.D.3d 566 (1st Dep't 2009).  In its decision the Appellate Division held, inter alia, that the trial court's "evidentiary rulings and denials of mistrial motions, including a motion that was based on a portion of the prosecutor's summation, were proper exercises of discretion."  Crique, 63 A.D.3d at 568.  On July 1, 2009, Crique's counsel sought leave to appeal to the New York Court of Appeals asking the court to review "all issues" raised in Crique's appellate brief.  See July 1, 2009 Letter to Hon. Jonathan Lippman (annexed as Ex. 10 to Resp. Appx.).  The Court of Appeals denied leave to appeal on October 23, 2009.  See People v. Crique, 13 N.Y.3d 835 (2009).

      E.      Present Petition

On September 14, 2010, Crique filed this petition pursuant to 28 U.S.C. § 2254, see

8

Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed Sept. 14, 2010 (Docket # 1), raising the following ground for relief: "Due Process- Denial of previously requested Brady Material," id. at 4.  On December 6, 2010, respondents filed a motion to dismiss the original petition arguing that any Brady claim was not exhausted.  See Notice of Motion, filed Dec. 6, 2010 (Docket # 14); Memorandum of Law in Support of Motion to Dismiss for Failure to Exhaust State Remedies, filed Dec. 6, 2010 (Docket # 15); Resp. Appx.

In response to the respondent's motion, Crique submitted an amended petition.  See Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, dated Dec. 13, 2010 (Docket # 26) ("A. Pet.").  The amended petition, which was accepted by the Court pursuant to Fed. R. Civ. P. 15(a)(1), see Order, filed Jan. 6, 2011 (Docket # 20), contains a different claim: that the prosecution's "disparagement of defense psychiatrist, Dr. [Bardey]," constituted a due process violation that denied Crique his right to present a defense.  See A. Pet. at 4.  The amended petition makes no mention of the denial of any exculpatory material.  On February 3, 2011, respondents filed papers in opposition to the amended petition, see Memorandum of Law in Support of Opposition to Petition for a Writ of Habeas Corpus, filed Feb. 3, 2011 (Docket # 23); Declaration Opposing Petition for a Writ of Habeas Corpus, filed Feb. 3, 2011 (Docket # 24), and Crique replied, see Reply in Response to Opposition and in Support of Amended Petition, filed Aug. 10, 2011 (Docket # 27) ("Pet. Reply").

II.   STANDARD OF REVIEW FOR PETITIONS BROUGHT PURSUANT TO 28 U.S.C § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in state court unless the state court's adjudication:

9

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and cites no relevant federal case law. Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") (citation omitted); see also id. at 784 (section 2254(d) deference applies even "[w]here a state court's decision is unaccompanied by an explanation"). Moreover, a state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). Habeas relief is available under the "unreasonable application" clause only

10

"if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been "objectively unreasonable" – a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Harrington, 131 S. Ct. at 786; accord id. ("even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"). In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question." Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir.), cert. denied, 130 S. Ct. 739 (2009). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); accord Brisco, 565 F.3d at 90 (court applying a "fact-dependent standard . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting Yarborough, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining

11

"[c]learly established federal law." Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008) (citation omitted). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Id. at 106-07 (citation omitted). Where there is "[n]o holding" from the Supreme Court on the question presented, Carey v. Musladin, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision cannot be contrary to or an unreasonable application of clearly established federal law. See Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citations and internal quotation marks omitted).

III.   DISCUSSION

   A.   Brady Claim

While Crique omitted his purported Brady claim from his amended petition, see A. Pet. at 4, Crique's supporting papers make reference to arguments that the prosecution violated his Due Process rights by improperly withholding exculpatory evidence from his defense. See Attachment to A. Pet. at 2 ("Not only did the prosecutor deny this petitioner the right to present a defense, but the prosecutor also deprive[d] this petitioner of his right to compulsory evidence and most possibly and probably, exculpatory evidence as well."); Pet. Reply at 1-4 (citing Williams v. Taylor, 529 U.S. 362, 406 (2000); Brady v. Maryland, 373 U.S. 83, 87 (1963); Pennsylvania v. Ritchie, 480 U.S. 39 (1987)) (other citation omitted). To the extent Crique's amended petition should now be interpreted as raising a Brady claim, this claim is barred

because it has not been exhausted in State court.

Under 28 U.S.C. § 2254(b)(1)(A), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." In O'Sullivan v. Boerckel, 526 U.S. 838 (1999), the Supreme Court held:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

Id. at 845; accord Smith v. Duncan, 411 F.3d 340, 347 (2d Cir. 2005). Thus, a petitioner is required to have presented each claim to all available levels of the state courts. See, e.g., Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("the prisoner must . . . fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review)") (internal quotation marks and citations omitted).

Crique's appellate brief lists three grounds for reversal. See Pet. Ap. Brief at I-v. Two grounds – relating to the justification defense and the argument that no intent to kill was proven – are not raised in the amended petition. The third ground listed is that the trial court improperly allowed evidence and argument regarding the victim, allowed "unwarranted disparagement of the defense expert," and gave improper instructions. Id. at ii-iii. While during the course of the argument, the defendant's Appellate Division brief discusses the prosecution's failure to provide defense counsel or the defense expert with contact information for Patricio's family, see Pet. Ap. Brief at 76-81, the brief provides these facts only as background for the prosecutorial misconduct claim, see id. at 81-85, and does not argue that the prosecutor's failure to divulge this information constituted a Brady violation. Nor was the claim presented in Crique's motion

13

pursuant to N.Y. Crim. Proc. Law § 330.30 to set aside the verdict.  See 330 Motion; 330 Aff.

If Crique indeed intends to present a Brady claim here, it would be unexhausted because it was not presented to all available levels of the state courts.  See Baldwin, 541 U.S. at 33 (claim not fairly presented to state courts where petitioner failed to explicitly argue the claim on appeal); Acosta v. Artuz, 575 F.3d 177, 188 (2d Cir. 2009).  In light of the fact that this is an unexhausted claim, we would deem it to be withdrawn from the petition because if we did not deem it withdrawn, we would be compelled to dismiss Crique's habeas corpus petition in its entirety on the ground that it is a "mixed petition" – that is, one containing both exhausted and unexhausted claims.  See, e.g., Rhines v. Weber, 544 U.S. 269, 274 (2005); accord Pliler v. Ford, 542 U.S. 225, 230 (2004) ("[F]ederal district courts must dismiss mixed habeas petitions."). Crique has not sought a stay to exhaust this particular claim and, in any event, nothing in the record would justify granting a stay inasmuch as he has not shown "good cause" for the failure to present the claim earlier or that the claim is potentially meritorious.  See Rhines, 544 U.S. at 278.[4]

    B.    Prosecutorial Misconduct Claim

        1.    Legal Principles

Prosecutorial misconduct on cross-examination and summation can constitute a due process violation when the conduct of the prosecutor "'so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process.'"  Greer v. Miller, 483 U.S. 756, 765 (1987) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)) (cross-examination);

---

[4] The Court assumes that Crique would prefer to have any such claim omitted from his petition rather than having the entire petition dismissed.  If, however, he preferred to have the entire petition dismissed, the Court would do so upon his request.

Darden v. Wainwright, 477 U.S. 168, 181-82 (1986) (summation). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer, 483 U.S. at 766 (citing cases) (internal quotation marks omitted). A prosecutor's remarks must be examined in the context of the entire trial and habeas relief will not be granted merely because "the prosecutors' remarks were undesirable or even universally condemned." Darden, 477 U.S. at 180-82 (citation and internal quotation marks omitted); accord United States v. Young, 470 U.S. 1, 11-12 (1985); United States v. Elias, 285 F.3d 183, 190 (2d Cir.), cert. denied, 537 U.S. 988 (2002). Instead, the petitioner must show that the prosecutorial misconduct caused "substantial prejudice." United States v. Whitten, 610 F.3d 168, 202 (2d Cir. 2010) (quoting Elias, 285 F.3d at 190). The Second Circuit has noted that "[r]emarks of the prosecutor in summation do not amount to a denial of due process unless they constitute egregious misconduct." Elias, 285 F.3d at 190 (quoting United States v. Shareef, 285 F.3d 71, 78 (2d Cir. 1999)) (internal quotation marks omitted).

"In assessing whether prosecutorial misconduct caused substantial prejudice, [the Second Circuit] has adopted a three-part test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." Whitten, 610 F.3d at 202 (quoting Elias, 285 F.3d at 190) (internal quotation marks omitted). "[T]he severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding." Elias, 285 F.3d at 191.

    2.    Analysis

Crique asserts that the prosecution's questioning of Dr. Bardey on cross-examination about his failure to interview Patricio's family as well as the prosecutor's remarks during summation constituted prosecutorial misconduct. See A. Pet.; Pet. Reply. Crique argues that the

15

prosecution's statements left the jury with the impression that Dr. Bardey was unprofessional and that his opinion was not to be trusted, which resulted in substantial prejudice to the defense. See A. Pet.; Pet. Reply

To recapitulate the facts: on direct examination of Dr. Bardey, defense counsel questioned Dr. Bardey as to the sources he relied upon in making his determination. (See Tr. 1088). During this line of questioning, Crique's counsel elicited that Dr. Bardey had not been "given access" to Patricio's family. (Bardey: Tr. 1089). On cross-examination, the prosecution asked Dr. Bardey whether he had sought to speak with them, withdrew the question, and then asked if there was any legal prohibition on Dr. Bardey speaking to them. (See Tr. 1183-84). After a sidebar, the trial judge told the jury that this second question was withdrawn. (Tr. 1184-86). As a result of the withdrawal of the questions, the jury was told that Dr. Bardey did not interview Patricio's family only because he was not provided access to them. Thus, Dr. Bardey's testimony left the jury with the impression that had Dr. Bardey been allowed to interview Patricio's relatives, he would have done so. Given these facts, there was little chance that the jury would have viewed Dr. Bardey as unprofessional. Moreover, there was an inherent improbability in the notion that the victim's family would have supported any EED defense and thus the jury would have been unlikely to attach any significance to the issue. All in all, the actions of the prosecutor in asking two questions of Dr. Bardey on this topic, and then withdrawing the questions, falls far short of constituting "misconduct" – let alone misconduct that violated due process. Moreover, the questions that were withdrawn were arguably legitimate efforts to probe the reason why Dr. Bardey did not interview Patricio's family.

As to the prosecutor's summation, the prosecutor simply repeated what had already been brought out by defendant himself during the direct examination of Dr. Bardey: that Dr. Bardey

16

had not interviewed any members of Patricio's family.  (Tr. 1532-33).  There was nothing improper in summarizing the evidence – or lack of evidence – on this question.  Moreover, the prosecutor's summation came only after defense counsel had attacked Dr. Kirschner's findings: specifically, defense counsel's claim that Dr. Kirschner's evaluation was uncorroborated.  (Tr. 1478-82).  Far from attacking Dr. Bardey's professionalism or integrity, the prosecution merely argued that Dr. Bardey's opinion was uncorroborated and that this weakness affected Dr. Bardey's conclusions.  Indeed, the prosecutor told the jury that he believed that Dr. Bardey "was being honest."  (Tr. 1545).  In the end, the prosecutor's statements merely provided the jury with an argument as to why Dr. Bardey's opinion was incorrect and why Dr. Kirschner's evaluation should be accepted.  Notably, the jury was instructed that "[q]uestions alone are not evidence," that they were "not to conclude from just a question alone that anything assumed in the question [was] true no matter how detailed or specific the [questions were]" (Tr. 1616), that "nothing that the attorneys said . . . in their summation [was] evidence in the case," and that the jury was "not required to accept the argument either party made during summations."  (Tr. 1614).

In his reply papers, Crique asserts that the prosecutor improperly disclosed the fact that defense counsel had represented Dr. Bardey on a traffic infraction and that this disclosure constituted prosecutorial misconduct.  See Pet. Reply at 6.  However, this statement – which was made during a conference between the prosecutor, defense counsel, and the trial judge – was made out of the presence of the jury (see Tr. 1073-74) and Dr. Bardey was never questioned about his traffic violation before the jury.  Thus the prosecutor's statements about defense counsel's representation of Dr. Bardey had no effect on the trial.

In sum, the record is devoid of conduct that is typically found to constitute prosecutorial misconduct, such as "manipulat[ing] or misstat[ing] the evidence" or "implicat[ing] other

17

Copies sent to:

Roger Jason Crique
07-A-5826
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Amyjane Rettew
Assistant District Attorney
One Hogan Place
New York, NY 10013

specific rights of the accused such as the right to counsel or the right to remain silent." Darden, 477 U.S. at 182 (citations and internal quotation mark omitted). Certainly it was not an unreasonable application of Supreme Court law for the Appellate Division to so conclude.

IV.   CONCLUSION

For the foregoing reasons, Crique's petition for writ of habeas corpus should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Paul A. Crotty, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Crotty. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: September 2, 2011
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge